DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By:     JESSICA JEAN HU
        ANTHONY J. SUN
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York  10007
Telephone:  (212) 637-2726 / 2810
Email: jessica.hu@usdoj.gov
        anthony.sun@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | 23 Civ. 631 (___) |
| Plaintiff, | |
| -against- | **COMPLAINT** |
| HIGH LIFE LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff the United States of America, by its attorney, Damian Williams, United States

Attorney for the Southern District of New York, files this Complaint against defendant High Life

LLC ("High Life"), alleging as follows:

**PRELIMINARY STATEMENT**

1.      The Government brings this civil fraud action against High Life pursuant to the

False Claims Act, 31 U.S.C. § 3729 *et seq*. (the "FCA"). From January 21, 2016, through June 1,

2016 (the "Relevant Time Period"), High Life violated the FCA by materially underreporting to

the United States Customs and Border Protection ("CBP") the value of apparel imported into the

United States and knowingly causing 67 customs entry forms to be presented to CBP that contained

inaccurate valuations of the apparel. By engaging in this fraudulent conduct, High Life avoided paying hundreds of thousands of dollars in customs duties owed on the imported goods.

2.    High Life purchases apparel from foreign vendors, who in turn contract with overseas factories to manufacture the apparel. When this apparel is imported into the United States, customs duties are owed to the United States. Prior to the Relevant Period, High Life's foreign vendors assumed the responsibility for declaring the value of the apparel to CBP and paying the duties owed.

3.    In December 2015, CBP detained numerous shipments of apparel sent by the foreign vendors to High Life due to concerns that the declared values were fraudulent. In response, High Life decided that going forward it would take on the responsibility of arranging for the importation of the merchandise. High Life transitioned its business model from purchasing the apparel on Landed Duty Paid terms, under which the price High Life paid the vendors included the costs associated with importation including customs duties, to purchasing the merchandise on Free on Board terms, under which the price paid to the vendors did not include these costs.

4.    During the time High Life was transitioning to this new pricing model, High Life materially underreported the value of previously ordered apparel contained in 67 shipments imported during the Relevant Period. High Life declared to CBP values that were based on the prices the foreign vendors purportedly paid to the factories for the merchandise, instead of using the prices High Life paid the vendors. However, the prices used for customs reporting purposes were determined after the orders for the apparel had been placed, after the pricing structure had been negotiated, and after the apparel was in production. It was improper to declare the imported merchandise using these values because the prices were not based on a bona fide sale between the vendors and the overseas factories, and were not the result of arm's length negotiations

2

between those vendors and the factories in the absence of any non-market influences. Indeed, High Life instructed the vendors on how to calculate and report the prices that High Life ultimately used to declare the values of the imported merchandise.

5.     High Life underreported the value of the previously ordered apparel in order to avoid paying the full customs duties owed. If High Life had paid duties to CBP based on the prices High Life itself had paid for the apparel, High Life would have paid significantly higher customs duties for the 67 apparel shipments.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the claims brought under the FCA pursuant to 31 U.S.C. § 3730(a), and 28 U.S.C. §§ 1331 and 1345.

7.     This Court may exercise personal jurisdiction over High Life pursuant to 31 U.S.C. § 3732(a), which provides for nationwide service of process.

8.     Venue is appropriate in this District pursuant 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because, at all times relevant to this case, High Life resided and regularly conducted business in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

9.     On November 29, 2022, High Life and the Government executed a tolling agreement, which tolled the period from January 13, 2020 to January 17, 2023, for the purpose of determining whether the Government's claims arising in connection with the importation of garments and apparel purchased by High Life had been filed timely.

## PARTIES

10.     Plaintiff is the United States of America.

11.     High Life is a New York limited liability company engaged in the importation and sale of apparel for men, women, and children. High Life's headquarters are located at 31 West 34th Street, New York, New York 10001.

## BACKGROUND

12.     All merchandise imported into the United States is required to be "entered," unless specifically excepted. 19 C.F.R. § 141.4(a); 19 U.S.C. § 1484. "Entry" means, among other things, that an importer or its agent must file appropriate documents with a CBP officer that allow the agency to assess the customs duties due on the merchandise being imported into the United States. 19 C.F.R. § 141.0a(a).

13.     The documents required to be filed with CBP in order to complete entry include: (i) a bill of lading or air waybill; (ii) a commercial invoice showing the value of the merchandise being imported; and (iii) CBP Form 7501 (the "entry summary form") declaring the value of the merchandise and the applicable duty rate. *See, e.g.*, 19 C.F.R. §§ 141.11, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a).

14.     In most cases, the amount of customs duty owed is equal to the declared value of the imported merchandise multiplied by the applicable duty rate.

15.     The value or approximate value of the imported merchandise must be declared in the commercial invoice and entry summary form. Federal law provides that every importer of record must file a declaration stating that the values set forth on these documents are accurate. 19 U.S.C. § 1485.

16.     The entry summary form includes a declaration that "the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities . . . and are true and correct" and that the declarant "will immediately furnish to the

appropriate [CBP] officer any information showing a different statement of facts." CBP Form 7501.

17.     Generally, importers of record are required to declare the "transaction value" of the goods, which is the price actually paid or payable for the merchandise plus, if applicable, certain additional costs incurred with respect to the merchandise. 19 U.S.C. § 1401a(a)(1)(A), (b)(1)(C).

18.     If certain criteria are met, importers of record may declare as the transaction value the price paid by a middleman from whom the importer of record purchased the goods. *See Nissho Iwai American Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992). Among other things, an importer of record may declare the value of imported goods based on the price the middleman paid the overseas manufacturer (the "First Sale Price") if the goods were the subject of a bona fide sale between the middleman and the manufacturer, the goods were clearly destined for export to the United States, and the middleman and the manufacturer dealt with each other at arm's length in the absence of any non-market influences that affected the legitimacy of the sales prices. *Id.* at 509; *see also Determining Transaction Value in Multi-Tiered Transactions*, T.D. 96-87, 30 Cust. Bull. 52 (Dec. 13, 1996) (setting forth, among other things, documentation requirements to establish a First Sale Price).

## FACTUAL ALLEGATIONS

### I.     High Life's Business

19.     High Life is a privately held family-owned company that designs, manufactures, and sells apparel for men, women, and children. High Life's customers include transnational and "big box" retailers, who in turn sell High Life's apparel directly to the public.

20.     Throughout the Relevant Time Period, High Life purchased apparel from overseas vendors located in China, Hong Kong, and Taiwan (the "Vendors"). The apparel was

manufactured by factories located in East Asia, including in China, Vietnam, and Cambodia (the "Factories").

21.     In the first step of its production process, High Life solicited bids from the Vendors to produce the apparel. High Life provided the Vendors with the design specifications for individual garments, or "styles," and identified each style through a High Life style number.

22.     The Vendors responded to High Life's bid solicitation with a proposed price per unit for each style number. High Life then reviewed the Vendors' bid responses and selected one of the Vendors to produce each style in High Life's portfolio.

23.     Once High Life selected a Vendor to produce each style, High Life issued a purchase order ("PO"), a contract specifying the style number, quantity, price, and delivery date for each style to be produced by a Vendor. Each PO was the governing contract between High Life and the Vendor and defined the terms under which the Vendor had agreed to produce and deliver the apparel to High Life.

24.     Due to the time required to manufacture and ship the apparel to the United States, High Life typically executed POs between 30 and 180 days in advance of when it anticipated needing the apparel to arrive at its warehouses.

25.     Once High Life issued the PO, the Vendor worked with the Factory to commence manufacture of the styles listed on the PO, in consultation with High Life's Design Team.

## II.     High Life Changed Its Business Model and Pricing Structure from Landed Duty Paid to Freight on Board After CBP Detained Shipments in December 2015.

26.     Prior to December 2015, High Life purchased apparel from the Vendors on Landed Duty Paid ("LDP") terms, meaning that High Life paid the Vendors a price inclusive of all costs associated with importing the merchandise and delivering the merchandise to High Life's

warehouses, including the cost of freight and customs duties. Under the LDP model, the Vendors assumed importation responsibilities and paid customs duties directly to CBP.

27.     In December 2015, CBP detained numerous shipments of apparel sent by the Vendors due to concerns that the declared values for the merchandise destined for High Life were fraudulent. In addition, CBP was concerned that various entities listed on the import paperwork did not appear to be bona fide parties to the transaction. CBP requested information and documentation related to the shipments and the corresponding customs entries.

28.     The documents and information provided by the Vendors did not support the transaction values that the Vendors reported on the entry summary forms.

29.     In light of the concerns surrounding the entry documents, High Life ultimately instructed the Vendors to revise the customs entries for the detained shipments and to declare as the transaction values the prices that High Life paid the Vendors, as reflected in the POs provided by High Life. These prices were substantially higher than the values the Vendors had initially declared. The amended entries resulted in the Vendors owing substantially more duties to CBP than were owed under the original customs entries filed by the Vendors.

30.     After these shipments were detained, High Life decided to transition its business model moving forward from purchasing imported goods on LDP terms to purchasing them on Free on Board ("FOB") terms. Under the new FOB model, High Life assumed importation responsibilities going forward, including the responsibility to declare the value of the imported goods and pay the associated customs duties. The price High Life paid the Vendors would no longer include the costs associated with importation.

31.     At the time High Life made this decision, it had already executed POs with the Vendors for numerous apparel orders using LDP-based prices. Some of these orders were already

in production, although the merchandise had not yet shipped. In addition, High Life already had entered contracts to sell the apparel to its customers for prices that had been negotiated based on the LDP prices High Life had agreed to pay the Vendors.

32.      High Life's projected profit margins for the sale of the previously ordered apparel was based on the LDP-based prices, and the projected margins assumed that the importation costs, including customs duties, would be paid by the Vendors. High Life could not achieve these projected profit margins if it declared to CBP the price High Life paid to the Vendors and needed to pay the associated customs duties.

III.    **High Life Materially Underreported to CBP the Transaction Values of Previously Ordered Apparel by Reporting First Sale Prices that Were Dictated by High Life and Based on a Formula Provided to the Vendors.**

33.      High Life materially underreported the value of previously ordered apparel shipped during the Relevant Time Period. High Life declared to CBP values that were based on the First Sale Prices that the Vendors purportedly paid to the Factories. However, the First Sale Prices used by High Life for customs reporting purposes were determined after the orders for the apparel had been placed, after the pricing structure had been negotiated, and in many instances, after the merchandise was in production. In fact, High Life directed the Vendors how to calculate the First Sale Price that would be reported to CBP, and provided the Vendors with a set formula to arrive at the First Sale Price. By declaring First Sale Prices that were not based on a bona fide sale between the Vendors and the Factories, and that were not the result of arm's length negotiations between the Vendors and the Factories in the absence of any non-market influences, High Life mispresented the value of the merchandise in order to avoid paying the full customs duties owed.

34.     As noted above, once High Life transitioned to the FOB model starting in January 2016, it assumed importation responsibilities for the apparel shipments. Because High Life could not achieve its desired profit margins for certain previously ordered merchandise if it declared the prices it was paying the Vendors for the merchandise, High Life opted instead to direct the Vendors on what to list as the First Sale Price and declared that price instead.

35.     Specifically, while transitioning from LDP to FOB pricing terms, High Life developed a formula that worked backwards from the existing LDP price to calculate what High Life wanted the FOB price and First Sale Price to be, in light of High Life's freight cost, desired profit margins, and desired duty amount. High Life then used that First Sale Price to declare the values of 67 shipments made during the Relevant Time Period (the "Subject Orders").

36.     High Life asked the Vendors to attempt to delay shipment of the Subject Orders until such time as High Life could determine how to declare the Subject Orders to CBP using the First Sale Price. For example, on December 24, 2015, High Life's Production Manager sent e-mails to the Vendors stating that "[a]s of now, we do not have the window when the First Sale can start. . . . Hopefully, we can start the First Sale on 1/09 ETD [estimated time of departure] onward shipments as we discussed. Meantime, if you have any shipment during the following 2-3 weeks, please contact [High Life] asking for extension. Hopefully we can hold as many shipments as possible until we finalize the First Sale."

37.     High Life alerted its Vendors on January 4, 2016, that it would start the new FOB/First Sale model beginning with shipments that had an estimated departure date of January 15, 2016. To facilitate that change, High Life directed its Vendors to complete a detailed spreadsheet for information concerning the Vendor's portion of the Subject Orders.

38.     High Life directed the Vendors to calculate the First Sale Price using High Life's formula that worked backwards from the existing LDP price. High Life did not ask the Vendors to report the price that the Vendors had already agreed to pay their Factories for the apparel at issue.

39.     When  directing the Vendors to calculate First Sale Prices in this fashion, High Life's Production Manager explained by email that the Vendors "must have a clear understanding [of] . . . how to prepare the supporting documents," *i.e.*, the invoices between the Vendors and the Factories that would be submitted to CBP to support the declared values.

40.     High Life's instructions to the Vendors sought to ensure that High Life could report to CBP a First Sale Price that resulted in customs duties that did not erode High Life's desired profit margins.

41.     In response to High Life's instructions, the Vendors e-mailed High Life with Excel spreadsheets that purported to reflect the First Sale Prices for the Subject Orders. Upon reviewing these spreadsheets, a member of High Life's production team sent an email to the Vendors directing them to "rework your FOB and First [Sale Price] based on the Highlife Estimate freight." High Life attached to this e-mail a revised Excel spreadsheet that contained High Life's estimated freight costs to transport the Subject Orders.

42.     Following their receipt of these e-mails, the Vendors each replied to High Life within 24 hours with revised Excel spreadsheets that reflected reverse-engineered First Sale Prices for the merchandise included in the Subject Orders that were calculated according to High Life's instructions.

43.     High Life ultimately approved the First Sale Prices reflected in the spreadsheets it received from the Vendors and then issued "revised" POs for the Subject Orders.

44.     Following receipt of High Life's approval, and prior to shipping the Subject Orders, the Vendors provided High Life with invoices between the Vendors and the Factories. These invoices purported to reflect that the merchandise in the Subject Orders had been sold by the Factories to the Vendors at the First Sale Prices dictated by High Life.

45.     When importing the merchandise in the Subject Orders and declaring the First Sale Prices as the transaction values, High Life understood that it could only declare the First Sale Prices as the transaction values if they were prices for goods that were the subject of a bona fide sale between the Vendors and the Factories, that the goods were clearly destined for export to the United States, and that the Factories and the Vendors dealt with each other at arm's length in the absence of any non-market influences that affected the legitimacy of the sales prices.

46.     In fact, the declared First Sale Prices were not the subject of a bona fide sale between the Vendors and the Factories or the result of arm's length negotiations between the Vendors and the Factories. Instead, the declared prices were the result of reverse-engineered calculations intended to preserve High Life's profit margins on pre-existing orders.

47.     High Life intended and expected that CBP would rely on the reported First Sale Prices when assessing and collecting the duties on the Subject Orders, and CBP did rely on this information.

48.     If High Life had paid duties to CBP based on the prices High Life had paid the Vendors for the merchandise included in the Subject Orders, instead of calculating the duties based on the purported First Sale Prices, High Life would have been required to pay significantly higher customs duties for the Subject Orders. By declaring the purported First Sale Prices as the values, High Life intended to avoid paying to CBP these higher customs duties.

49.     As a result of High Life's misrepresentations, CBP failed to collect hundreds of thousands of dollars in customs duties properly owed by High Life for the Subject Orders.

**CLAIM FOR RELIEF**

**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**
**Reverse False Claims**

50.     The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

51.     The Government seeks relief against High Life pursuant to Section 3729(a)(l)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(l)(G).

52.     As set forth above, High Life knowingly made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property, in the form of customs duties, to the United States, and knowingly concealed and knowingly improperly avoided or decreased an obligation to pay or transmit money or property, in the form of customs duties owed, to the United States.

53.     The Government incurred losses in the form of customs duties underpaid by High Life because of its wrongful and fraudulent conduct.

54.     By virtue of High Life's failure to accurately report the transaction value of the merchandise included in the Subject Orders, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

\* \* \*

WHEREFORE, the Government respectfully requests that judgment be entered in its favor and against High Life as follows:

1.     For a sum equal to treble the Government's damages in an amount to be determined at trial, civil penalties to the maximum amount allowed by law, and an award of costs pursuant to 31 U.S.C. § 3729(a); and

2.     Such further relief as the Court may deem proper.

Dated:   New York, New York
         January 25, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
*Attorney for the United States of America*

By:      s/ Anthony J. Sun
         JESSICA JEAN HU
         ANTHONY J. SUN
         Assistant United States Attorneys
         86 Chambers Street, 3rd Floor
         New York, New York 10007
         Tel:  (212) 637-2726 / 2810
         jessica.hu@usdoj.gov
         anthony.sun@usdoj.gov